May it please the court, my name is Nicholas Markey. I represent the petitioner Mr. Sanjaa. The court is aware this is a petition from review from the Board of Immigration Appeals affirming the denial of his request for relief. Specifically, Mr. Sanjaa applied for withholding and cancellation and removal. As noted in the record, the asylum application pursuant to INA 208 was pre-termitted as it was not timely filed. In reaching the decision in the board affirming the decision of the IJ, the board found and the IJ found that Mr. Sanjaa, A, could not establish that he was a member of a particular social group and B, that he could not show a nexus or that he was protected under the act by the immigration judge in ruling his decision found that while a police officer can be a PSG, in this case it was not. Finding and relying, I believe, on Dela Cruz that Mr. Sanjaa was working on his investigation with the authorities as a police officer doing his duties and the retaliation was from the criminal organization. However, the record is, I would point out that Mr. Sanjaa was found credible. The judge found him credible, found that his submissions to his application supported his claims, supported the individuals who he listed and testified about. Can I just ask you a question that's troubling me? I'm very sympathetic to his case given the whole series of incidents of things that happened to him, but then taking all of that and fitting it into the immigration statutes is somewhat of a tall order for you. So if we take the, and so let's take first the police officer situation. In Ayala versus Holder, we had said that if a former police officer is singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he's not without more essentially targeted because of a social group. How does your client get around that? We get around that, Your Honor, by this. In addition to doing his job, as noted in his investigation, the two individuals, a party of this investigation, were the singer Mr. Logservan and the son of the parliament officer. That's how we get around it. And the fact that... Well, they're famous people. Right, but there was testimony provided by the respondent that he indicated that he had observed his supervising officer talking with these individuals at the police station in the hallways. So you take it further there than Ayala because now you have a situation where he sees that the corruption is ongoing. Now, if he would only have testified to the fact that, oh, there was corruption in the police officer, the police and these individuals were working together via corruption and had nothing more, I would agree that he would have a stretch to get to beyond Ayala. But he doesn't have any whistleblowing, does he? I believe that he does. Now, how is by raising the issue to his supervisors. Now, the court may say, well, just raising the issue of this problem that you have corruption in government isn't sufficient. I believe that with the evidence he submitted, the corruption documentation that was submitted to the pre-hearing statement, I think it starts at page 271, an anti-corruption for the Department of State report. Further down, I think at 374. I thought the record was pretty clear that he didn't assert to his boss anything about being corrupt. He only told his co-workers. His co-workers told him to keep quiet unless he had any proof. And they didn't ever do anything, and he didn't ever do anything. Well, I would concede. So then I said to myself, I don't know where the proof is. Again, the proof would come from the submitted documentation from the Department of State and the corruption reports that were provided on the human rights. But there could be a ton of corruption. But what the BIA said is we're not persuaded that his discussions with co-workers is an expression of anti-corruption beliefs sufficient to support a whistleblower claim. So take it that there's corruption from the State Department reports, but we're kind of missing the connection between him and reporting. And it would be our position that his reporting, while it may be tenuous and to his friends, and that what he saw at the police station would support it. Mindful that there is testimony that he did not report the issue specific. However, he did and was investigated by these other officers from the different unit or different city, I believe it was, that came out and questioned him, and he did testify. I think if we look at the full range of the facts, I think that would be sufficient. If this were the case where this individual did nothing, said, well, I went and I did this investigation as an undercover officer and then I was beaten, I would say that that would be sufficient for a denial. But however, here he did establish or he did present evidence of some corruption from his point of view. And I think that that was sufficient. So that kind of gets us into the standard of review because it does support the corruption allegation, but then does it compel it? And that's where we have this quite high hurdle in these immigration cases. Especially in withholding. And then after that, cat. Yes. And I can . . . well, I agree. The burden is high on the respondent at that level to present the evidence. The question then comes to, if we look at the prior case law, is what can . . . to support his claims? And what I submit to the court is, it is a high burden, but that burden is also moved to the fact that he was found credible and his witnesses were found credible. So that would go to meeting that higher burden. If the judge . . . But they think what was missing is that in all his credibility, he didn't have the facts about whistleblowing. So, I mean, you can believe everything he says, but the way I read the BIA is that it doesn't tip you over the edge. And my position, again, is . . . Is that it would? Yes, it would. Did you want to reserve . . . All you've got to do is be credible, and you meet your . . . even though there's nothing that really says what you've got to say, since you are credible, I'm to give you an inference, and that makes the burden? No. What I'm saying is, you've got to be credible, but your record also has to have additional evidence put into the record. And in this case, we have submissions from Department of State. We have human rights reports. But those are general. My good colleague really put her finger on those. It doesn't seem to me that those really add much. They don't attack this specific situation at all. But they do raise the inference of the problem there. Combined with the fact that he submitted articles that supported the people that he was talking about and what had occurred to them. This isn't a generalized argument that he doesn't have anything else. I understand your argument. Thank you. Thank you. Yes, sir. Do you want to address the U.N. treaty rights, or do you not? I will address it in the sense that I believe that that is an issue that the immigration judge did not raise. The Board of Immigration Appeals said you don't have it because it doesn't give you an independent right to relief. And I understand the case law on that. But then my question is, to what extent, then, is it important at all for the immigration judge? Does it not mean that if we have these ratifications of these treaties and we're talking to an immigration judge and they say, well, it doesn't mean anything because it's not law, to what extent does an immigration judge rely on it, or does he even have to rely on it, even though it is a treaty and even though the immigration judges and those of us who do immigration law deal with these treaties on a daily basis? I would suggest that the court remand it to the immigration judge for an analysis under that. Is to what extent does the U.N. treaty play on this case? The government will say, well, it's not law. It's not enacted. It's not self-executing. Therefore, it doesn't apply. Well, then why do we have it? Why do we even apply it in immigration proceedings? Why not say we don't have to file and listen to these treaties? That's the subject of a lot of treatises, okay? I understand that. I understand. But the short answer is some treaties are different from others. Not all treaties are created equal. That's the short answer. Correct. And that's all I have. Okay. Thank you. Good morning, Your Honors. Andrew Nzinga on behalf of the Attorney General. May it please the Court. Andrew Nzinga. I'm sorry. I just said that. Petitioner was an undercover police officer who was caught in the course of his investigations. While the harm that he suffered is sympathetic, all the harm that flowed from that, it does not create a nexus to protect a ground and does not demonstrate acquiescence by the Mongolian government or a public official. Finally, the U.N. Treaty Against Transnational Organized Crime simply does not create a relief or protection and Petitioner simply has not presented any clear argument to suggest otherwise. For withholding, Petitioner bears the burden to establish a nexus to protect a ground. It's sort of an ever-changing amorphous ground, but primarily it's been imputed political opinion and former police officer. The problem is a lack of evidence. Petitioner is asking you to say, well, the record, he would have to say, the record compels inference to inference to inference to inference, but the record doesn't. There's corruption. Okay. Where is there any evidence that the criminals knew about any supposed anti-corruption belief or they've imputed to them? There's not. On page 132 to 133 on the record, DHS counsel asks him, do you have any proof of a connection between these people and the police? The answer, no. What Petitioner really places emphasis on is one single incident, an incident that simply doesn't compel the conclusion. He saw his captain talking to some criminals in a police station. That's it. If that were sufficient to compel the conclusion that, first of all, the police officer is corrupt and then the criminals were motivated by this corruption, I suggest every AUSA police officer, FBI agent, and any law enforcement officer now has a compelling record of being corrupt. It just doesn't compel the conclusion of the string that he wants this court to make. For the whistleblower claim, first, the government maintains that it is abandoned because his opening brief does not discuss it. Raising for the first time an oral argument really just does not provide this court or respondent with really adequate discussion. Suffice it to say, though, he didn't blow the whistle. That's a fundamental part of being a whistleblower. He did not, contrary to what Petitioner simply just told this court, he did not tell his supervisor. He told his colleagues, hey, you know, I think there's some corruption going on. What they said to him is don't report it unless you have proof, and proof being the important issue before the Mongolian police and this court. On pages 120, 121, 123, 124 of the record, repeatedly he's asked, did you report any of this about this corruption to the police? No, I didn't have any proof. Well, so as I understand it, he saw these individuals talking to someone at the police station, but we don't know what was said. No idea. And then later they actually are arrested, correct, for the crime? Exactly. So what he said he saw, he saw the singer Lukog Vasarin talking to the captain. That person is ultimately charged and convicted of a crime. So the problem is does the record compel the conclusion, again, of this string of inferences for withholding? For the former policeman claim, the other sort of claim, the problem is, again, that all this stems from his being apprehended, from his being caught as an undercover police officer. Under Cruz, Navarro, and Ayala, that's simply not related, that's not a protected ground, being a current police officer. There's simply no evidence to compel the conclusion that they were actually motivated by him being a former police officer. Like Ayala, this is a police officer who was caught in their organization. They did not like that. It's sympathetic. I don't think I've ever argued a case that's not sympathetic, Your Honor. These cases involve a lot of ugly facts, but we have to look at the legal standards that Congress provided. And finally, turning to cap protection, again, the acquiescence argument stem relies on a string of inferences that just aren't supported by the record. Yes, there's corruption among gullying government. The police are not always effective. But Garcia-Millian says the police do not have to be effective in order to somehow satisfy their needs under the international treaties. It's petitioner's burden to show that someone would acquiesce. We're not even quite sure who petitioner is suggesting would be the actual person acquiescing. And it does, again, this returns back to the singer was convicted of a crime. The Naram Batar, the son of the Member of Parliament, it's unclear. The newspaper article he submitted says he didn't get away with it, but apparently was not actually convicted. But if we were to require for somehow that the nation states to simply convict someone and throw away the key in order to say, well, but now they're not acquiescing, that's a standard no country, including the United States, would ever really satisfy its requirements. So, again, it's just a string of inferences that don't compel the conclusion that the Mongolian government or public official would acquiesce to the torture. What's your position on the treaty? Well, Your Honor, I think as perhaps just illustrated, this may not be the best case for this court to be considering the matter. We do think it's abandoned. Petitioner's claim to this court was a factual distinction of GK. But what we really need argument on is, is the treaty self-executing under Medellin versus Texas? It's fairly straightforward. Why do you say the claim was abandoned? Did he not argue that in his opening brief? He argues a factual distinction, but a factual distinction doesn't. He claims protection under the treaty, correct? He claims treaty, yes. Now, tell me why that claim is without merit. Well, what we need is argument about whether the treaty is self-executing or not. And we just don't have any. What's your reason why it's not self-executing? Well, first of all, in Medellin versus Texas, the Supreme Court requires either something explicit, such as this treaty is self-executing and is now enforceable as domestic law. How about the context? The context, again, does not. So Article 24 is primarily an article about witness protection. To the extent he would actually be considered a witness against a transnational organized crime, the Article 24 says the state shall take appropriate measures. Where is the evidence of transnational? Well, the agency didn't reach that issue, Your Honor, but I'm not quite sure that the record would support such a suggestion. That would, of course, be the agency in the first instance. But Petitioner's brief makes that statement but does not cite to the record. At the end of the day, these are drug dealers, and while that may involve transnational organized crime, there's simply no evidence of it. But when we look at Article 24, it says the nation states shall take appropriate measures. And then just give suggestions. It may do witness protection, relocation, all these things. It may do a variety of things. But may doesn't mean that you look at this treaty and says, ah, I can apply for relief or protection from removal under this treaty. Fundamentally, what Petitioner doesn't even identify is even if it were self-executing, what would this protection look like? And when we look at the Second Circuit's decision in Doe and the Board's decision in G.K., what we know is that the President and the Senate looked at this when they ratified and said, hey, we have sufficient federal and state law to protect people in these situations. Petitioner's claim basically boils down to I didn't win, so therefore I must be entitled to something. At the end of the day, not every alien is going to win a relief from protection or removal. So looking at the decisions in Doe and G.K., this treaty was not self-executing and does not afford any relief or protection from removal. So we ask the Court deny the petition. Thank you. Thank you. We have a little bit of time for rebuttal if you'd like. Well, you used your time, but I'm going to give you a minute for rebuttal. No, thank you. No? All right. Thank you. The case just argued is submitted, Sanja versus Sessions, and we're adjourned for the morning. Thank you both, Counsel. And for the week. What? And for the week. And for the week. Yes.
judges: McKeown, Bea, N.R. Smith